IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW JOSEPH DICKS,           *

    Plaintiff,                 *

v.                             *        Civil Action No. GLR-17-2554

WARDEN FRANK BISHOP, JR., et al.,   *

    Defendants.                *
                ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Motion to Dismiss, or in the Alternative, for Summary Judgment filed by Defendants Frank B. Bishop, Jr., Warden at the North Branch Correctional Institution ("NBCI"); Jeff Nines, NBCI Assistant Warden; Robin Wolford, Deputy Director of the Inmate Grievance Office ("IGO"); Jason Harbaugh, NBCI Captain; April Carr, NBCI Sergeant; Charlotte Zies, NBCI Correctional Case Management Specialist II ("CCMS II"); and Andrew McKinney, Irvin Murray, and Jeffrey Grabenstein, NBCI Correctional Officers (collectively, "State Defendants").[1] (ECF No. 43). Former Commissioner Patricia A. Moore joins in the Motion. (See ECF No. 59).[2] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For

---

[1] Lt. Bradley Wilt, C.O. II Bennett, Property Officer, and Mailroom Clerk Mary Jane Rose, have not been served with the Complaint, and the Complaint will be dismissed against them for that reason. Even if Wilt, Bennett, and Rose were served, the Court would dismiss the Complaint against them pursuant to 28 U.S.C. § 1915(a) for failure to state a claim for the reasons set forth in Sections II.C.2–5, infra.

[2] The Clerk shall amend the docket to reflect the full and correct names of Defendants.

the reasons outlined below, the Court will grant State Defendants' Motion, construed as one for summary judgment.

## I.     BACKGROUND

### A.    Plaintiff's Allegations

Plaintiff Andrew Joseph Dicks is a state prison inmate presently housed at Jessup Correctional Institution, in Jessup, Maryland. (Jason Harbaugh Decl. ["Harbaugh Decl."] ¶ 3, ECF No. 43-5). He alleges that while confined at NBCI in Cumberland, Maryland, the conditions of his confinement violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments. (Compl. at 3,[3] ECF No. 1).[4]

### 1.     Tampering with Plaintiff's Money Order

Dicks alleges that former mailroom employee Mary Jane Rose mishandled his mail, impeding his access to the courts. (Id. at 4–5). Specifically, he contends that in February 2015, Rose failed to properly handle a money order he sent to an attorney. (Id.). Afterward, Defendant Harbaugh interviewed Dicks and advised him that if he "signed off" on a Request for Administrative Remedy complaint ("ARP"), Dicks would be permitted to mail the money order back to the company where he bought it for a full refund. (Id. at 5). Dicks claims that Rose held the money order for an additional three months and when he asked for reimbursement for the money order, she refused because he was not the purchaser of the money order. (Id.). Dicks claims that Rose held his mail in retaliation and also claims

---

[3] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[4] Dicks' claims against medical providers were previously resolved by this Court. (See ECF Nos. 48, 49).

that Rose violated Department of Public Safety and Correctional Services ("DPSCS") mail policies. (<u>Id.</u> at 7, 10). He claims that his ARP and ARP appeal regarding this matter were dismissed. (<u>Id.</u> at 7–9). At the time he filed the complaint, Dicks was still awaiting reimbursement for the money order. He also claims that his criminal appeal was dismissed because his legal mail was not given to him. (<u>Id.</u> at 10).

### 2. Interfering with Plaintiff's Medical Care

Dicks claims that Defendants Nines, Wilt, and Bennett, along with Sergeant Jane Puffenbarger, interfered with his medical treatment for sores and lesions on his body including a recurring itchy facial rash. (<u>Id.</u> at 10). Dicks states that he needs to use beard trimmers more than once a month to assist him with managing his skin problem and to deter the rash, but Defendants denied his request to do so. (<u>Id.</u> at 11). He filed a grievance numbered ARP-NBCI-1512-15 regarding his need to use trimmers more frequently. (<u>Id.</u> at 11–15).

### 3. Injuries Arising from Sleeping Arrangements

Dicks asserts that Defendants Bishop and Nines have a policy that provides a chair to inmates in the general population to facilitate access to the top bunk, but denies such assistance to inmates assigned to disciplinary or administrative segregation (hereafter, "segregation inmates"). (<u>Id.</u> at 17). On July 4, 2015, Dicks slipped while accessing the top bunk, injuring his neck and shoulder and exacerbating a pre-existing back injury. (<u>Id.</u>). Dicks filed an ARP that was found to be meritorious in part, but the IGO dismissed his grievance. (<u>Id.</u>).

Dicks states that he was denied treatment following his injury, but that Bishop and Nines maintain that he declined treatment. (Id. at 18). Dicks counters that if he had declined treatment, he would have had to sign a Release of Responsibility form, which he did not do. (Id.). He alleges that Warden Bishop and Assistant Warden Nines allowed Wexford to violate his right to medical care under the Eighth Amendment. (Id. at 17–20).

### 4. Harm Relating to NBCI Bathroom Policies

Dicks states that inmates are denied access to a toilet and sink during their recreation time in the prison yard. (Id. at 20). He also complains that inmates must shower and use the telephone within the one hour and fifteen minute recreation period, causing him to "[forfeit] his [First Amendment] right to intimate association" with his family on the telephone and his right to shower if he wishes to use the toilet during that period of time. (Id.). Dicks further alleges that the failure to provide toilets and sinks in the prison yard violates his rights under the Eighth Amendment because he has a right to sanitary conditions. (Id.).

Dicks has an enlarged prostate that causes him both an inability to hold his urine and need to urinate frequently. (Id. at 22). On February 6, 2016, Dicks was denied access to a toilet and was told by an unidentified correctional officer that he would have to wait for the next shower change to "lock in" to use the toilet. (Id. at 21). Dicks asked if he could use the "holding cell" bathroom, which was empty and only fifteen feet away, but was refused. (Id.). As a result, Dicks "was forced to relieve himself in his pants." (Id.). On August 11, 2016, Dicks urinated on himself again after being denied bathroom access. (Id.

at 22). Dicks filed an ARP regarding these incidents, but it was denied, and the IGO dismissed his grievance. (Id. at 21–22).

### 5.       Interfering with Plaintiff's Religious Practices

During Ramadan in 2016, correctional officers stopped Dicks and other inmates and told them they could not enter Ramadan services unless they allowed the officers to confiscate religious items which the officers deemed inappropriate, including "Message to the Black Man," "Theology of Time," and the "Final Call" newspaper. (Id. at 24). Dicks states the books are from the Nation of Islam and the literature was approved by prison administration for Muslim inmates to order. (Id.). Dicks filed an ARP regarding the issue, but Nines dismissed the claim, stating that Dicks brought "non-allowable items" to the service. (Id. at 25). The IGO also dismissed his grievance. (Id.). Dicks argues that the administration should not be permitted to tell Muslim inmates what they can study. (Id. at 24).

### 6.       Improperly Labeling Plaintiff

Dicks states that he was "flagged" as a member of a security threat group ("STG," i.e., a gang) and Harbaugh had a "duty" to tell him he was flagged. (Id. at 26). He also states that Defendant Zies had a duty to inform him that he was the subject of a Prison Rape Elimination Act ("PREA") alert. (Id.).

As to the STG designation, Dicks states that Harbaugh lied when he told the Commissioner's Office that he interviewed Dicks. (Id. at 27). Dicks states that he was flagged as a member of the Black Guerrilla Family ("BGF") gang when he tried to move into a cell with a fellow inmate. (Id. at 26). Dicks filed an ARP regarding these issues on

February 11, 2016, which was found to be meritorious in part by the Commissioner. (Id. at 26–27). Dicks states that Harbaugh wrote a false report and that this was another example of the wardens ignoring meritorious ARPs. (Id. at 27). He claims the STG flag prevented him from contact visits with his children and grandchildren. (Id.). He also states that he is escorted through general population in handcuffs, which puts him at a risk of harm. (Id.).

Dicks asserts that Harbaugh and Nines stated he was "screened" for PREA on May 14, 2014, which was the same day Dicks was given a Maximum II security classification without an interview. (Id. at 28). He states that Zies prepared a declaration relating to these dates in a separate lawsuit. (Id.). On May 5 and 6, 2015, Harbaugh and Nines agreed that Dicks should be removed from the behavioral management program and placed in Housing Unit 2 with the general population. (Id.). Dicks states that he has a liberty interest in not being labeled a rapist and that the label places his safety in jeopardy. (Id.). Dicks filed an ARP and a grievance with the IGO regarding this issue. (Id. at 28–29).

**B.    Defendants' Response**

**1.    Tampering with Plaintiff's Money Order**

On February 11, 2015, Dicks voluntarily withdrew ARP No. NBCI-0291-15, which related to NBCI mishandling his money order. (Harbaugh Decl. ¶ 4; Money Order Rs. at 1, 6, ECF No. 43-6).[5] Harbaugh avers that he did not convey or promise to Dicks that he would be allowed to return the money order for a refund in exchange for withdrawing the

---

[5] For the reasons set forth in Section II.A, infra, the Court will treat Defendants' Motion as a motion for summary judgment under Federal Rule of Civil Procedure 56. Accordingly, the Court will consider documents outside Dicks' Complaint in resolving the Motion.

ARP. (Harbaugh Decl. ¶ 5). On June 9, 2015, Dicks filed ARP No. NBCI-1103-15, in which he again alleged that Rose mishandled his money order. (Rose ARP at 1, ECF No. 43-7). NBCI dismissed the ARP for procedural reasons upon finding that the issue was previously resolved and repetitive of ARP No. NBCI-0291-15. (Id.).

Joseph Cutter, NBCI Investigation Captain, explains that incoming and outgoing mail received by the NBCI mailroom is processed in accordance with approved policies and DPSCS directives. (Joseph Cutter Decl. ¶ 3, ECF No. 43-8). According to Cutter, Dicks' mail was not withheld in retaliation, delayed, or not processed, providing that the mail was in compliance with approved policies and directives of DPSCS. (Id. ¶ 4).

All legal mail at NBCI is logged and forwarded to the proper housing unit for delivery to the inmate. (Id. ¶ 5). The "Legal Mail Log" is maintained by mailroom staff, who document the name and Division of Correction ("DOC") identification number of the inmate receiving the mail, the name of the sender, the date the mail was received at the institution, and the signature of the inmate receiving and accepting the mail. (Id.). Only incoming mail is logged. (Id.). No outgoing mail, including legal mail, is logged. (Id.). Cutter avers that to the best of his knowledge, no mailroom employee hindered the delivery or sending of Dicks' mail; rather, Dicks' mail was received and handled like all other mail at the institution. (Id. ¶ 6; see also Executive Directive No. OPS.250.0001 at 3–11, ECF No. 43-9 (describing procedures for handling inmate mail)).

### 2.    Interfering with Plaintiff's Medical Care

Bishop asserts that as Warden, his responsibility is solely to act as chief administrator of NBCI. (Frank Bishop Decl. ["Bishop Decl."] ¶ 4, ECF No. 43-11). In that

capacity, he oversees the administration of personnel and programs to ensure the safe, efficient, and lawful functioning of the facility. (Id.). In the Maryland prison system, medical care is provided to inmates by private health care contractors. (Id. ¶ 5). It is beyond the scope of Bishop's duties and responsibilities to perform any medical, dental, or mental health treatment, or to prescribe a particular course of treatment. (Id. ¶¶ 6–7). Further, Bishop does not have the authority to dictate the type of medical treatment an inmate is to receive or to influence the medical decisions of health care providers. (Id.). He maintained that he did not involve himself in, interfere with, or delay the medical care provided to Dicks. (Id. ¶ 8). Further, Bishop states that he has no knowledge of any staff becoming involved in, interfering with, or delaying medical care to Dicks. (Id. ¶ 10).

On July 26, 2015, Dicks filed ARP No. NBCI-1512-15, in which he asserted that he was placed on segregation on June 29, 2015, and that although he provided a doctor's order to be able to use trimmers on his face due to a skin condition, he was not permitted to do so. (July 2015 Beard Trimmer ARPs at 1, ECF No. 43-12). Specifically, he alleged that on Mondays and Thursdays, when other inmates were permitted to shave using a razor— which Dicks states he cannot use due to his skin condition—Puffenbarger and Bennett denied him access to a beard trimmer. (Id.).

The ARP was dismissed on July 28, 2015 with a notation that Dicks may resubmit his complaint and answer certain clarifying questions, including whether the doctor's order was written while he was on disciplinary status and whether trimmers were allowable property for segregation inmates. (Id.). The dismissal also instructed Dicks to provide a

sheet listing allowable property for segregation inmates and to advise whether he was given "the opportunity to attend barbershop/face trim once a month." (Id.).

After Dicks resubmitted the ARP, NBCI investigated his allegations and on August 17, 2015, dismissed the complaint without merit. (Id. at 4). NBCI's investigation found that Dicks' medical records indicated it was recommended that he shave less to relieve the irritation shaving caused due to his skin. (Id. at 4, 8–9). Additionally, Housing Unit 1 offered beard trimming with electric clippers once per month during scheduled haircuts and, as such, Dicks had the opportunity to receive reasonable beard maintenance. (Id. at 4). Dicks appealed, and the DOC dismissed the appeal on October 21, 2015. (Id. at 10–11).

On August 26, 2015, Dicks filed ARP No. NBCI-1853-15 alleging that Zies failed to properly investigate ARP No. NBCI-1512-15 regarding the use of beard trimmers. (August 2015 Beard Trimmer ARPs at 1, ECF No. 43-13). Finding that Dicks' allegations were "without merit," Nines dismissed the ARP on September 3, 2015, and advised Dicks that he needed to address his dissatisfaction with the dismissal of ARP No. NBCI-01512-15 not through the NBCI ARP department, but with Headquarters through the appeal process. (Id.). Dicks appealed Nines' decision and the DOC dismissed the appeal. (Id. at 11–12). The DOC decision noted that NBCI did not violate the doctor's order and that no additional action was warranted through the ARP process. (Id. at 12).

### 3.    Injuries Arising from Sleeping Arrangements

According to Harbaugh, in the absence of a doctor's order requiring an inmate to be assigned to a bottom bunk for medical reasons, NBCI inmates may be assigned to either a top or bottom bunk. (Harbaugh Decl. ¶ 6). Inmates assigned to top bunks are instructed to

climb carefully in and out of the bunk at the back of the bunk. (Id.). NBCI provided general population inmates one plastic chair per cell for use in the cell or while participating in indoor recreation. (Id. ¶ 7). Due to security concerns, NBCI does not provide plastic chairs to segregation inmates. (Id.).

On July 18, 2015, Dicks filed ARP No. NBCI-1468-15, in which he alleged that he slipped and injured his shoulder getting into his top bunk and had not yet been seen by a physician. (Bed ARP Rs. at 1, ECF No. 43-14). NBCI investigated the ARP and dismissed it as without merit on August 15, 2015. (Id.). The investigation found that Dicks saw a nurse on July 4, 2015 and an x-ray was ordered. (Id.). He received the x-ray on July 8, 2015, and though Dicks had a follow-up appointment the following day, he declined to be seen. (Id.).[6] Dicks eventually saw a provider on July 28, 2015, who advised him of his x-ray results and recommended he request yoga books from the library. (Id.). Dicks' x-rays showed mild degenerative changes in his right shoulder, but there was no evidence of acute fracture, dislocation, subluxation, or any significant abnormality. (Id. at 9).

On August 24, 2015, Dicks appealed the dismissal of the ARP. (Id. at 15). The DOC found his appeal meritorious in part because the ARP response failed to fully respond to Dicks' complaints. (Id. at 13–19; Bishop Decl. ¶ 9). On December 23, 2015, Bishop sent a compliance memorandum to Patricia Moore, DOC Acting Commissioner, assuring her that he would fully respond to future ARP complaints. (Bed ARP Rs. at 13). The DOC noted,

---

[6] According to Harbaugh, NBCI advises inmates that refusing to attend scheduled medical/dental passes as directed by staff may result in a disciplinary adjustment. (Harbaugh Decl. ¶ 11). Inmates are required to report for their passes and then can sign off the appointment. (Id.).

however, that Dicks had been seen by medical staff, that an x-ray showed no significant abnormalities, and that Dicks had declined follow-up. (Bed ARP Rs. at 16). The appeal investigation also noted that the provider's assessment and plan did not include an order for bottom bunk status and that no such order existed. (Id.).

### 4.     Harm Relating to NBCI Bathroom Policies

Bishop asserts that inmates at NBCI are provided recreation in accordance with the DPSCS Executive Directive for Inmate Recreation Programs. (Bishop Decl. ¶ 11; see generally Executive Directive No. OPS.145.0001, ECF No. 43-15). Recreation is not mandatory. (Bishop Decl. ¶ 11). The NBCI Inmate Handbook informs inmates that they must stay in the courtyard until the conclusion of the recreation period. (Id.). Dayroom recreation that is conducted within the housing unit is structured by the individual housing unit's staff and opportunities for inmates to return to their cells varies by unit. (Id.).

On February 8, 2016, Dicks filed ARP No. NBCI-0346-16, complaining that he urinated on himself during recreation on February 6, 2016. (Feb. 2016 Restroom ARPs at 1, ECF No. 43-16). Dicks resubmitted the ARP on February 12, 2016. (Id. at 3). Nines dismissed the ARP, finding that as substantiated by two Matters of Record, inmates in Housing Unit 3 were provided an opportunity to return to their cells at least every fifteen minutes when the showers are being emptied and filled. (Id.). Thus, NBCI found that Dicks failed to return to his cell when given the opportunity and further failed to provide any evidence to substantiate his claim. (Id. at 1, 3, 5–9). The DOC subsequently dismissed Dicks' appeal. (Id. at 11–13).

On August 15, 2016, Dicks filed ARP No. NBCI-1842-16, in which he again alleged that he was forced to urinate on himself after being denied bathroom access during indoor recreation. (Aug. 2016 Restroom ARPs at 1, ECF No. 43-17). NBCI investigated the allegations and dismissed the ARP as without merit. (Id.). Video footage reviewed during the investigation showed Dicks standing in front of a hot pot and throwing water on his shirt and shorts in an attempt to appear as through he had urinated on himself. (Id.). Additionally, staff on duty reported that Dicks did not contact them about the need to use the bathroom. (Id. at 1–6). The DOC later dismissed Dicks' appeal. (Id. at 7–8).

### 5.    Interfering with Plaintiff's Religious Practices

In ARP No. NBCI-1332-16, Dicks complained that in June 2016, his religious rights were violated when Defendants Grabenstein, Carr, and McKinney (incorrectly identified in the ARP as McKenzie) prevented him and approximately fifty other Muslim inmates from entering a Nation of Islam Ramadan class with their study materials. (Harbaugh Decl. ¶ 8; Religious ARPs at 1–2, ECF No. 43-18). According to the Matters of Record submitted by the officers, the inmates were sent back to their housing unit because of additional non-allowable property items they brought with them to the meeting. (Id. at 1).

According to NBCI, the rules for general population inmates observing Ramadan permit an inmate to bring a Quran, Bible and "Final Call" newspaper with them to Nation of Islam Ramadan services. (Id. at 1, 4–10). Thus, Dicks' ARP was dismissed at both the institutional level and on appeal. (Id. at 1, 12–27; Harbaugh Decl. ¶ 9). Harbaugh avers that he does not have any knowledge of any staff interfering with Dicks' right to practice his religion or confiscate any approved religious materials. (Harbaugh Decl. ¶ 10).

### 6.      Improperly Labeling Plaintiff

According to Zies, on May 6, 2014, Dicks was moved from Housing Unit 1 to Housing Unit 2 after he completed the Behavior Management Program. (Charlotte Zies Decl. ["Zies Decl."] ¶ 4, ECF No. 43-21). On May 14, 2014, she conducted a PREA screening interview with Dicks in accordance with DPSCS directives. (Id. ¶ 5; see also Executive Directive No. COS.200.0005, ECF No. 43-22 (setting forth DSPCS policies for assessing the risk of sexual victimization and abusiveness)). The interview indicated Dicks was "[a]t [r]isk of [a]busiveness." (Zies Decl. ¶ 5). Dicks was informed of the outcome of the screening at the conclusion of the interview. (Id. ¶ 6). Zies avers that Dicks is not labeled a sex offender or rapist. (Id. ¶ 8). On the same day that Zies completed the PREA screening, she also completed a Security Reclassification and recommended Dicks' security level be increased to Maximum II. (Id. ¶ 7). Dicks was informed of Zies' recommendation during the interview. (Id.). Zies avers that she has not retaliated against Dicks in anyway. (Id. ¶ 9).

David Barnhart, NBCI Intelligence Lieutenant, states that he reviewed records maintained by the DPSCS Intelligence Unit showing that Dicks was validated as a member of BGF and is currently listed as "inactive" in the group as of January 11, 2017. (David Barnhart Decl. ¶¶ 3, 5, ECF No. 43-24). Contrary to Dicks' allegation that his STG designation was the result of misrepresentations by Harbaugh, Harbaugh avers that he has not lied or sent false reports to the Commissioner's Office regarding Dicks. (Harbaugh Decl. ¶ 12).

On September 24, 2015, Dicks filed ARP No. NBCI-2013-15, complaining that he had been incorrectly labelled as a member of an STG and given a "PREA flag". (Labeling ARPs at 1–3, ECF No. 43-23).

As set forth above, Dicks claims the STG flag prevented him from contact visits with his children and grandchildren. Inmate visits are governed by an executive directive. (See Executive Directive No. OPS.195.0003 ["Inmate Visits Dir."], ECF No. 43-20). Bishop maintains that general population inmates who are validated members of a STG are afforded the same visiting privileges as inmates who are not validated members of a STG. (Bishop Decl. ¶ 13). Segregation inmates and inmates classified as Maximum Security II, however, are only granted non-contact visits. (Bishop Decl. ¶ 13; Inmate Visits Dir. at 5).

### 7.    Plaintiff's History of ARPs and Grievances

Between September 17, 2012 and November 21, 2016, Dicks filed forty-one ARPs while housed at NBCI. (Dicks NBCI ARP Index, ECF No. 43-25). Samiya G. Hassan, an administrative officer at the IGO, avers that she reviewed IGO records regarding complaints or grievances filed by Dicks as to the issues raised in the Complaint and found only three relevant grievances: IGO No. 20152459, IGO No. 20160995, and IGO No. 20161491. (Samiya Hassan Decl. ["Hassan Decl."] ¶¶ 2, 3, ECF No. 43-26)

Dicks filed the grievance appeal underlying IGO No. 20152459 on December 29, 2015. (Id. ¶ 3a). The appeal sought a review of the denial of ARP No. NBCI-2013-15, wherein Dicks complained he had improperly been labeled as a member of a STG and a "PREA predator." (Id.). The IGO dismissed the grievance on May 29, 2016 for failure to state a claim. (Id.). Dicks filed the grievance appeal underlying IGO No. 20160995 on May

31, 2016. (Id. ¶ 3.b). The appeal disputed the denial of ARP No. NBCI-0346-16, in which

Dicks had alleged that on February 6, 2016, he was denied access to a toilet while in the

recreation hall. (Id.). The IGO dismissed the grievance on October 18, 2016 for failure to

state a claim. (Id.). Finally, IGO No. 20161491 involved a grievance appeal Dicks filed on

August 19, 2016. (Id. ¶ 3.c). That appeal sought to overturn the denial of ARP No. NBCI-

1336-16, which alleged that on June 10, 2016, Dicks was denied permission to bring

unidentified items into a Nation of Islam study group. (Id.). The IGO dismissed the

grievance for failure to state a claim. (Id.).

## C.   Procedural History

On August 31, 2017, Dicks filed a Complaint against Defendants alleging

unconstitutional conditions of confinement and denial of medical care in violation of the

First, Fourth, Eighth, and Fourteenth Amendments. (Compl. at 3).[7] Dicks included as

Defendants in the Complaint the State Defendants and Commissioner Patricia A. Moore,

---

[7] Well past the deadline for amending as a matter of course and without seeking leave from the Court, Dicks filed an Amended Complaint on June 27, 2018. (ECF No. 45). While captioned an "Amended Complaint," the pleading does not involve the same events as those described in the original Complaint. Rather, it appears designed to supplement the Complaint by adding several defendants and recounting a series of events only tangentially related to those described in the Complaint. Indeed, the Amended Complaint does not appear to include any of the allegations contained in the original Complaint. This is improper in light of the general rule that "an amended pleading ordinarily supersedes the original and renders it of no legal effect." Young v. City of Mt. Ranier, 238 F.3d 567, 572 (4th Cir. 2001) (quoting Crysen/Montenay Energy Co. v. Shell Oil Co., 226 F.3d 160, 162 (2d Cir. 2000)). As Dicks failed to seek leave to file an amended complaint in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court, the original Complaint will remain the operative complaint in this matter.

as well as Nurse Practitioner Janette Clark, Nurse Practitioner Krista Self, and Registered Nurse Robert Claycomb (the "Medical Defendants").

The Medical Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on January 24, 2018. (ECF No. 21). Dicks opposed the Motion, and Medical Defendants filed a Reply (ECF Nos. 29, 32). On June 13, 2018, State Defendants filed a separate Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 43). Dicks filed an Opposition on July 5, 2018. (ECF No. 46). State Defendants did not file a Reply.

On August 20, 2018, the Court entered a Memorandum Opinion and Order granting the Medical Defendants' Motion. (ECF Nos. 48, 49). In that Opinion, the Court stated that it would address the allegations against State Defendants in a separate opinion. (Mem. Op. at 2, ECF No. 48). An erroneous docketing notation then mistakenly closed the entire case, leaving State Defendants' dispositive motion unresolved. Upon discovering the error, the Court conducted a preliminary review of State Defendants' Motion and determined that a Defendant listed in the Complaint as "Commissioner P.A. Mourey" was in fact Defendant Moore. The Court thus granted the Maryland Attorney General additional time to determine whether its office would represent Moore and to file any appropriate response on Moore's behalf. (ECF No. 52). On February 24, 2021, Moore joined State Defendants' previously filed dispositive motion. (ECF No. 59).

## II.   DISCUSSION

**A.   Standard of Review**

**1.   Conversion**

State Defendants style their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. "A motion styled in this manner implicates the Court's discretion under Rule 12(d)[.]" Pevia v. Hogan, 443 F.Supp.3d 612, 625 (D.Md. 2020) (citation omitted). Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and "a reasonable opportunity for discovery." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (citation omitted). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey,

381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)). The Court "does not have an obligation to notify parties of the obvious." Laughlin, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) (citation omitted). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To successfully raise the need for additional discovery, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor & City Council of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Est. of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a

memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit.'" Harrods, 302 F.3d at 244 (quoting Evans, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Evans, 80 F.3d at 961). Despite these holdings, the Fourth Circuit has indicated that there are some limited circumstances in which summary judgment may be premature, notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. See id. A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[] as the functional equivalent of an affidavit." Id. at 244–45 (quoting First Chi. Int'l v. United Exch. Co., 836 F.2d 1375, 1380 (D.C. Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Dicks was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Dicks about the Motion and the need to file an opposition. (See Rule 12/56 Letter, ECF No. 44). Dicks filed an Opposition, as well as additional correspondence with the Court, but did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Dicks' Complaint in resolving Defendants' Motions, the Court will treat the Motion as one for summary judgment.

## 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**C.    Analysis**

**1.    Respondeat Superior**

Dicks' theory of liability as to Defendants Bishop and Nines is premised exclusively on the doctrine of respondeat superior. In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor

21

in the constitutional injuries they inflict on those committed to their care.'" <u>Baynard v. Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. <u>See</u> <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Such evidence is lacking in this case. First, Dicks' claim against Bishop and Nines is wholly conclusory and divorced from any factual allegations in the Complaint. Dicks has failed to allege any facts that could give rise to an inference that Bishop or Nines had actual or constructive knowledge of the misconduct alleged in this case, much less that they responded with deliberate indifference to that alleged misconduct. Accordingly, this claim is subject to dismissal.

### 2. Administrative Exhaustion

Defendants contend that portions of Dicks' complaint are subject to dismissal pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because they have not been properly presented through the administrative remedy procedure. The PLRA provides in pertinent part that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading standard on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007); see also Anderson v. XYZ Corr. Health Services, Inc., 407 F.2d 674, 682 (4th Cir. 2005). A claim that has not been exhausted may not be considered by this Court. See Jones, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. See Ross v. Blake, 136 S.Ct. 1850, 1856–57 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second

PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any DOC official or employee. Md. Code Ann., Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. See C.S. § 10-206(b). Inmates housed at an institution operated by DPSCS may avail themselves of the administrative grievance process designed for inmate complaint resolution. See generally C.S. § 10-201 et seq.; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining an ARP).

A prisoner in a Maryland Division of Corrections ("DOC") institution must file an ARP with his facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file

24

an appeal with the Commissioner of Corrections. Id. 12.02.28.14(B)(5). If the Commissioner of Corrections denies the appeal, the prisoner has thirty days to file a grievance with the IGO. Id. 12.02.28.18. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. Id. 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); see also COMAR 12.07.01.07(B). An order of dismissal constitutes the final decision of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). An inmate has not exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

Dicks failed to exhaust his administrative remedies regarding his access to courts/mail claims; medical claims; denial of accessibility to top bunk; denial of access to a bathroom during recreation on August 11, 2016; Maximum II security classification; retaliation; false reports; and failure to protect. (See generally Dicks NBCI ARP Index; Hassan Decl. (identifying the three grievances Dicks pursued through the IGO)). As set forth in Section I.B.7, supra, while Dicks instituted the ARP process as to a number of his claims, he only appealed three of the dismissals to the IGO and received results prior to instituting this case: ARP Nos. NBCI-2013-15, NBCI-0346-16, and NBCI-1336-16. (Id.). These grievances related to Dicks' complaints that he was wrongly labeled as an STG

member and PREA predator; denied use of the bathroom on February 6, 2016; and denied permission to carry certain items into the Nation of Islam study group during Ramadan.

As discussed above, the PLRA requires that inmates exhaust all available remedies prior to filing a civil suit.[8] Because Dicks failed to exhaust administrative remedies, the Court will dismiss Dicks' claims relating to tampering with his mail and money order; interfering with his medical care; injuries arising from his sleeping arrangements; harm arising from NBCI bathroom policies; Dicks' Maximum II security classification; and any alleged retaliation, false reports, or failure to protect. The Court considers Dicks' remaining claims in turn.

### 3. Improperly Labeling Plaintiff

Dicks claims that NBCI improperly flagged him as a member of the BGF when he tried to move into a cell with a fellow Muslim and improperly labeled him as a sex offender following his PREA screening. (Compl. at 26–29). Dicks' claim fails.

---

[8] Dicks provides evidence demonstrating that he did appeal his claim regarding use of beard trimmers to the IGO. (Misc. Pl.'s Exhibits at 11, ECF No. 46-1 (reflecting December 20, 2017 dismissal of Dicks' grievance by IGO). The IGO appeal, however, was not resolved until after Dicks instituted this case. Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. See Neal v. Goord, 267 F.3d 116, 121–22 (2d Cir. 2001), overruled on other grounds by Porter, 534 U.S. 516. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the U.S. Court of Appeals for the Sixth Circuit stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." See also Kitchen v. Ickes, 116 F.Supp.3d 613, 625–26 (D.Md. 2015) (refusing to allow claim to move forward premised on allegations contained in an ARP filed after plaintiff filed his complaint in federal court), aff'd, 644 F.App'x 243 (4th Cir. 2016).

Prisoners have a limited constitutional right, grounded in the due process clause, to have prejudicial erroneous information expunged from prison files and they are deprived of this right if prison officials refuse to expunge material after being requested to do so. Paine v. Baker, 595 F.2d 197, 202 (4th Cir. 1979), cert. denied, 444 U.S. 925 (1979). However, it is not sufficient that a prisoner simply disputes evaluations and opinions about him. Id. The allegedly erroneous information must have been relied on to a "constitutionally significant degree" in order to state a claim. Id. "If the information is relied on to deny parole or statutory good-time credits, or to revoke probation or parole, the inmate's conditional liberty interest is at stake and the due process clause is called into play." Id. (citing Wolff v. McDonnell, 418 U.S. 539 (1974)).

Prisoners do not have a constitutional right to access programs or to demand to be housed in one prison versus another, absent a showing of significant hardship. See Cole v. Pepper, No. GJH-18-3097, 2019 WL 4750295, at *7 (D.Md. Sept. 30, 2019). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." Meachum v. Fano, 427 U.S. 215, 224 (1976). Limitations on a prisoner's liberty interests are not unconstitutional unless they impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Thus, before deciding whether Dicks is entitled to due process, it must be determined if the conditions under which he was confined constituted an atypical and significant hardship.

Assignment to administrative segregation does not create an atypical and significant hardship. See Hewitt v. Helms, 459 U.S. 460, 467 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life). Additionally, inmates are not entitled to be housed at any particular security classification or cell. See McKune v. Lile, 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise"); see also Veney v. Wyche, 293 F.3d 726, 734 (4th Cir. 2002) ("In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns facing [the] inmates[.]"); Slezack v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994) ("[T]he security and custody classification of state prison inmates is a matter for state prison-official discretion whose exercise is not subject to federal procedural due process constraints.").

Dicks has failed to allege, much less demonstrate that he timely objected to the STG designation. Defendants explain that Dicks has been validated as a member of a STG. He has offered nothing to refute their finding. Moreover, validated members of STG housed in general population are entitled to the same privileges as other non-designated inmates in the general population. He has failed to demonstrate that he suffered any loss of liberty as a result of the STG designation. As such, even if the designation of Dicks as a member of the BGF was erroneous, he has failed to demonstrate any injury arising from his designation, and thus cannot satisfy a due process claim.

Similarly, as to Dicks' claim regarding his PREA screening, the screening simply indicated that Dicks was at risk of abusiveness. It did not label him as a sex offender or

rapist and he has failed to allege, much less demonstrate, how use of such screening materials was improper or violated his right to due process. Accordingly, Defendants are entitled to summary judgment on this claim.

### 4. Conditions of Confinement

Dicks' allegation that he was denied the use of the bathroom on February 6, 2016 is most fairly construed as an Eighth Amendment conditions of confinement claim. The claim is unavailing.

For a prison official to be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement, "the official [must know] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837; see also Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. See Farmer, 511 U.S. at 834, 837.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury.'" Danser v. Stansberry, 772 F.3d 340, 346 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 834). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36 (1993). Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "'deliberate indifference' to inmate health or

safety." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302–03 (1991)). Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that the officials drew such an inference. Id. at 837. Where prison officials respond reasonably to a risk, they may be found not liable. Id. at 844.

Dicks contends that Defendants acted with deliberate indifference to his safety because they forced him to participate in recreation without access to a bathroom. Dicks' claim fails to satisfy either component of Eighth Amendment liability. Although urinating on himself on one occasion is certainly unfortunate, Dicks has failed to demonstrate a serious physical or emotional injury arising from this one occurrence, nor has he introduced evidence that it placed him at a substantial risk of injury. See Danser, 772 F. 3d at 346–47 (quoting Farmer, 511 U.S. at 834).[9] At bottom, Dicks has failed to allege sufficient facts regarding the essential elements of his conditions of confinement claim—serious physical or emotional injury or a substantial risk of injury—to create a genuine dispute regarding a material fact. See Celotex Corp., 477 U.S. 317 at 322–23 (1986). Similarly, Dicks has

---

[9] While an inmate need not wait until he is actually harmed, he still must show that he was exposed to an existing unreasonable hazard or condition. Helling, 509 U.S. at 35–36. Moreover, the hazard must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." Id. at 33, 34; see also Baze v. Rees, 553 U.S. 35, 50 (2008). Dicks has not presented evidence sufficient to prove either condition. At best, Dicks has presented allegations of "isolated incidents" that fail to demonstrate a sufficient risk of future harm. Shrader v. White, 761 F.2d 975, 978 (4th Cir. 1985) (quoting Withers v. Levine, 615 F.2d 158, 161 (4th Cir. 1980)). Thus, Dicks is not entitled to relief based on a theory of risk of future harm.

failed to introduce evidence of actual knowledge of this risk on the part of prison officials. Indeed, Defendants have introduced unrefuted evidence that inmates in Housing Unit 3 were provided an opportunity to return to their cells at least every fifteen minutes during recreational time, and Dicks failed to return to his cell when given the opportunity. (See Feb. 2016 Restroom ARPs at 1, 3, 5–9).

When considering claims that conditions of confinement constitute cruel and unusual punishment, "courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" Rhodes, 452 U.S. at 351 (quoting Bell, 441 U.S. at 539). Here, Dicks' challenges to NBCI's policies regarding recreation and lack of access to sanitary facilities during recreation fail to meet the objective component of an Eighth Amendment claim. Thus, Defendants are entitled to judgment on this claim.

### 5. Ramadan Services

Dicks alleges that Defendants violates his First Amendment rights when they did not allow him to attend Ramadan services with unapproved Nation of Islam materials. He is not entitled to relief on this claim.

It is well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free

exercise of religious beliefs without concern for the possibility of punishment. See Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam). Prison restrictions that affect the free exercise of religion but are related to legitimate penological objectives, however, do not run afoul of the constitution. See Turner v. Safely, 482 U.S. 78, 89–91 (1987).

Courts consider the following factors in determining if the restrictions on religious exercise are related to legitimate penological objectives:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

Wall v. Wade, 741 F.3d 492, 499 (4th Cir. 2014) (quoting Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006)). Under the Free Exercise Clause, a prisoner has a clearly established right to a diet consistent with his religious principles. Wall, 741 F.3d at 498–500.

Dicks contends that he was turned away from the Ramadan study group because he had a "Last Call" newspaper, which he maintains he was permitted to have for the study group. Dicks did not identify the materials he possessed when he was turned away from the meeting when he filed his ARP. In his Complaint, however, Dicks references several publications that Nation of Islam inmates are allowed to purchase, but which are not on the list of approved items that Nation of Islam inmates were authorized to take into the meeting. Dicks does not clarify whether he attempted to bring only the materials authorized for the meeting with him on that date.

Even assuming <u>arguendo</u> that Dicks was entitled to possess the materials and enter the meeting, his claim is unavailing. Put simply, there is no allegation that the officers' conduct in turning Dicks away from the meeting was anything more than an error on the part of staff regarding what property Dicks was permitted to take into the meeting. Dicks must establish that Defendants <u>intentionally</u> interfered with his religious practices. Negligent interference with religious exercise is not remediable under the First Amendment. <u>Lovelace v. Lee</u>, 472 F.3d 174, 194 (4th Cir. 2006); <u>Meyer v. Teslki</u>, 411 F.Supp.2d 983, 991 (W.D.Wis. 2006). Dicks has not introduced evidence of intentional interference here. Accordingly, Defendants are entitled to judgment on this claim.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 43). A separate Order follows. Entered this 17th day of September, 2021.


_____/s/_____
George L. Russell, III
United States District Judge